**STATE of Missouri, Respondent,**

v.

**Richard D. SMITH, Appellant.**

**No. WD 38500.**

Missouri Court of Appeals,
Western District.

Aug. 18, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 29, 1987.
Application to Transfer Denied
Nov. 17, 1987.

Sean D. O'Brien, Public Defender, S. Dean Price, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Carrie Francke, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, C.J., and SHANGLER, PRITCHARD, TURNAGE, CLARK, MANFORD, LOWENSTEIN, BERREY and GAITAN, JJ.

TURNAGE, Judge.

Richard D. Smith appeals from his convictions of involuntary manslaughter, § 565.024.1, RSMo Cum.Supp.1984, and armed criminal action, § 571.015, RSMo 1978. He argues that his rights under the federal and state constitutions were violated by the prosecutor's improper use of peremptory challenges in jury selection and that the court erred in numerous respects in instructing the jury.

Affirmed.

Smith killed Mary Hennessy by brutally beating her during the course of sado-masochistic sexual activities on the evening of August 18, 1985. Smith used various objects to beat and injure Hennessy, including a cane, electrical wiring and plastic car molding. Hennessy died on August 20, 1985 as a result of wounds from the beating.

Smith was charged with Second Degree Murder and Armed Criminal Action by committing Second Degree Murder with and through the use, aid and assistance of a dangerous instrument. The jury convicted Smith of Involuntary Manslaughter and Armed Criminal Action in connection with Involuntary Manslaughter.

### I.

Smith's first point is that the court erred in failing to discharge the petit jury on the grounds that the prosecutor used peremptory challenges to strike five jurors on the basis of race.

Smith is a white man. The prosecutor in this case used five of his six peremptory challenges to strike black people from the jury. Two black people served on the jury of twelve; blacks thus constituted 16.66% of the actual jury. Blacks constituted 20% of the population of Jackson County, according to the 1980 Census of Population published by the United States Department of Commerce, Bureau of the Census, a fact which this court judicially notices. *Varble v. Whitecotton,* 354 Mo. 570, 190 S.W.2d 244, 246 (banc 1945).

At trial, Smith moved to discharge the petit jury on the ground that the state used

its peremptory challenges in a systematic effort to exclude blacks from the jury. Counsel cited the case of *People v. Wheeler*, (apparently referring to *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978)). The court denied the motion.

In his motion for new trial, Smith again objected to the state's use of its peremptory challenges, this time on the ground that such use denied Smith equal protection of the laws under the fourteenth amendment to the federal constitution, as construed in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

■ This argument ignores the fact that the *Batson* court specifically limited its holding to cases in which the defendant shows "that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." 106 S.Ct. at 1723. Accordingly, *Batson* does not support Smith's argument that a white man's equal protection rights are violated by invidious use of peremptory challenges to exclude blacks from his jury. *See State v. Christensen*, 720 S.W.2d 738, 739 (Mo.App.1986).

Nor has any case been cited or located which holds that a member of one race is denied equal protection when members of another race have been stricken from his jury. In fact *Fields v. People*, 732 P.2d 1145, 1150 (Colo.1987), quotes W. LaFave and J. Israel, *Criminal Procedure*, Ch. 21, § 21.2 at 709 (1984), that under equal protection a challenge can only be made by a defendant who is a member of the excluded class. The court added that under equal protection the right to be tried by one's peers is not so clearly undermined when the members excluded are not members of the same group as the defendant. *Id.* at 1150[1, 2].

This court concludes that Smith is not entitled to relief under *Batson* on an equal protection argument.

■ Smith now argues that the prosecutor's acts violated Smith's rights under the sixth amendment to the federal constitu-

tion and Mo. Const. Art. I, § 22(a), to be tried by an impartial jury. However, Smith failed to raise these arguments, either at trial or in his new trial motion. Consequently, neither the sixth amendment nor the Missouri Constitution claims were preserved for review. *Kansas City v. Howe*, 416 S.W.2d 683, 686–87 (Mo.App.1967).

However, even if Smith had preserved these contentions, he would not be entitled to relief. In *Roman v. Abrams*, 822 F.2d 214 (2d Cir.1987), the defendant was white. The Second Circuit held that a prosecutor's use of peremptory challenges to prevent any whites from sitting on the jury on account of their race would violate the defendant's sixth amendment right to the possibility of a jury reflecting a fair cross section of the community. *Id.*, at 227–228. However, the court held that in the case before it the prosecutor had not excluded whites to such an extent that the petitioner was deprived of his sixth amendment rights:

> Where ... the actions of the prosecutor have not succeeded in excluding the targeted group and have not reduced the petit jury representatives of that group dramatically below the group's percentage in the venire or in the population of the community, it is difficult to see that the defendant has in fact been denied the possibility that the Sixth Amendment guaranteed him [of a jury comprising a fair cross section of the community]. Rather, if that group is not significantly underrepresented, it appears that the possibility constitutionally guaranteed to the defendant has come to fruition and that the defendant has therefore not been injured by the prosecutor's efforts to eliminate the cross-section possibility.

*Id.*, at 229. The court concluded that the jury in question contained a percentage of whites approximating the white population in average venire panels in Bronx County and in the community of Bronx County at large. Therefore, the petitioner was not entitled to habeas corpus relief.

■ This court finds the ruling of *Roman* on this point to be persuasive. While the sixth amendment does not require the

petit jury to meet a fair cross section test, it does require the venire to reflect the composition of the community at large. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758; 1764–65, 90 L.Ed.2d 137 (1986). See *Batson,* 476 U.S. ——, n. 6, 106 S.Ct. 1717 n. 6, 90 L.Ed.2d 80 n. 6. A criminal defendant has the right to be tried by a jury whose members have been selected by nondiscriminatory criteria. *Batson,* 476 U.S. ——, 106 S.Ct. 1717, 90 L.Ed.2d 80[7]. Thus, the right assured is that the petit jury will be drawn from a venire that represents a fair cross section of the community by a purely random method without any consideration of race.

■ This court joins the *Roman* court in condemning the practice of striking venire members on the basis of race, but when the effort to exclude persons because of race from a jury does not succeed in reducing the number of a particular race below the percent of that race in the community or on the venire, relief cannot be granted on the ground that the jury did not represent a fair cross section of the community.

■ The action of the prosecutor did not reduce the petit jury dramatically below the percent of blacks in the community. Thus, Smith was not injured by the prosecutor's peremptory strikes even if it could be said that they were used in a discriminatory manner. Thus, even if Smith's sixth amendment and Missouri Constitutional claims were considered, they would not entitle him to any relief.

### II.

For his second point, Smith argues that the trial court erred in submitting an instruction permitting the jury to find him guilty of Armed Criminal Action in committing Involuntary Manslaughter, when he was only charged with the offense of Armed Criminal Action in committing Second Degree Murder.

■ Involuntary Manslaughter is a lesser included offense of Second Degree Murder. § 565.025.2(2)(b), RSMo Cum. Supp.1984. This court has specifically held that a defendant charged with Armed Criminal Action in the commission of a felony may be convicted of Armed Criminal Action in the commission of a lesser included felony. *State v. Taylor,* 724 S.W.2d 531, 533–36 (Mo.App.1986). Therefore, Smith's second point is denied.

### III.

Smith's third point is that he was placed in double jeopardy by the court's submission of the Armed Criminal Action instruction, which permitted the jury to convict him of Armed Criminal Action either in connection with commission of Second Degree Murder or Involuntary Manslaughter. Smith argues that the instruction could have permitted the jury to find him guilty of "conduct constituting Murder in the Second Degree after acquitting him of that conduct in Count I."

■ Smith's argument is in essence an attack on the MAI–CR2d instructional scheme for submitting Armed Criminal Action. If Smith's argument were taken to its logical conclusion, it would mean that the court could never submit an Armed Criminal Action instruction based on a felony after it had given an instruction on the felony itself, for the jury might acquit on the underlying felony and convict on the Armed Criminal Action. Yet, MAI–CR2d 25.02, the appropriate instruction on Armed Criminal Action in Smith's case, clearly contemplated that by the time the court instructed on Armed Criminal Action, it would have already instructed on the underlying felony. This is obvious because the first element of the Armed Criminal Action verdict director is "that the defendant is guilty under Count —— of ([name of the [underlying] offense ...])"; the instruction presumes that the underlying offense has already been defined in the verdict director on that offense. Thus, MAI requires instructing on Armed Criminal Action after instructing on the underlying felony. This court will not deem an instruction prescribed by the Supreme Court in MAI–CR to be in error. *State v. Newlon,* 627 S.W.2d 606, 614 (Mo. banc), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74

L.Ed.2d 149 (1982). Smith's third point is denied.

## IV.

■ Smith's fourth point is that the court erred in not instructing the jury as to what specific items used by Smith they might find were "dangerous instruments" in applying the Armed Criminal Action instruction. This argument is frivolous, since the court defined "dangerous instrument" in its instructions precisely as prescribed in MAI–CR2d 33.01. The court's use of the prescribed MAI–CR instruction will not be deemed error. *Id.*

## V.

■ Smith's final point is that the court erred in giving MAI–CR2d 1.02 and 2.20, in that these instructions improperly defined "reasonable doubt." The Supreme Court has upheld the definition in MAI–CR2d 2.20 against the same argument Smith makes. *State v. Guinan,* 732 S.W.2d 174, 177 (Mo. banc 1987). Since Smith challenges the same language in each instruction, the *Guinan* holding concludes his argument against MAI–CR2d 1.02 as well as MAI–CR2d 2.20. Smith's final point is denied.

## CONCLUSION

The judgment is affirmed.

KENNEDY, SHANGLER, PRITCHARD, CLARK, LOWENSTEIN, BERREY and GAITAN, JJ., concur.

MANFORD, J., dissents in separate dissenting opinion.

MANFORD, Judge, dissenting.

I must respectfully dissent.

This dissent takes no exception to the factual account set forth in the majority opinion. Even a casual reading of the transcript reveals both bizarre and reprehensible conduct by the parties involved.

This case, along with countless others of present origin, illustrates that in this age, the matter of guilt or innocence of one accused of criminal conduct is of secondary importance. Currently, the disposition of criminal cases rests mainly upon issues injected by the accused, innovative members of the Bar, and varied pressure groups, all of whom readily recognize the existence of a wide representation within the judiciary eagerly willing to repeatedly declare itself society's conscience. Sometimes, as this dissent hopes to illustrate, our courts, while claiming to act in the name of social justice, in reality establish a less than desired result, perhaps even bordering on hypocrisy.

One matter needs clarification. In the majority opinion, it is concluded that appellant failed to properly preserve the issue of the violation of his rights under the Sixth Amendment. Anyone who has even a minimum working knowledge of appellate procedure in our state knows that an appellant must preserve an issue for review. We have specific rules which require such preservation. Anyone with like knowledge also knows that our reviewing courts often dispose of appeals simply upon the lack of preservation of issues. In addition, it is readily apparent that too often the noting of a lack of preservation suggests a lack of merit to the appellant's assertion. It should be noted in all fairness to the majority opinion, that after noting the lack of preservation for review by appellant of his alleged Sixth Amendment violation, the issue was discussed.

In order that the record be totally clear, however, it should be pointed out that this case was first submitted to a division of this court in the usual manner. There was a difference of opinion over the Sixth Amendment issue, and the case was assigned for reargument before the court en banc. In preparation for the reargument, this court, by letter, advised counsel for the prosecution and defense that they were granted leave "to resubmit, supplement, or otherwise modify the presentation and argument on Point 1" (the Sixth Amendment issue). Counsel were, within the same letter, asked to consider and comment on certain court decisions from other states on the issue.

The point is that by the action of this court, the Sixth Amendment issue is clearly

before this court for disposition and appellant's failure to have properly preserved the issue is moot.

Reduced to its simplest format, appellant's assertion is that the trial court erred in failing to quash the petit jury because the prosecution impermissibly utilized its peremptory challenges to strike a number of prospective jurors on the basis of their race.

An analysis of what transpired regarding selection is as follows, and the persons named, of course, refer to particular veniremen:

Verdun Norwood stated that his brother was a security guard. There were similar responses by jurors # 1, Clark, # 3, Allen, # 7, Miller, # 9, Callahan, # 15, Foley, # 17, Hern, # 21, Heil, # 24, Williams, # 25, Porter, # 26, Birdsong, # 31, Sharp and # 39, Reynolds did not lead to them being peremptorily stricken by the State. These prospective jurors were non-blacks. Verdun Norwood also stated that he had some first aid training. A similar response by jurors # 7, Miller, # 15, Foley, and # 21, Heil did not lead to them being peremptorily stricken by the State. They are all non-blacks. Verdun Norwood also stated that he had some psychological training. A similar response by jurors # 7, Miller and # 39 Reynolds did not lead to them being peremptorily stricken by the State. They are both non-blacks. Lastly, Verdun Norwood stated that his brother had served time in the penitentiary. A similar response by jurors # 17, Hern, # 24, Williams and # 30, McBride did not lead to them being peremptorily stricken by the State. They are both non-blacks.

Sylvester Roseburr made only one resonse (sic) during voir dire. He stated that he had been a victim of automobile tampering. A similar response by juror # 7, Miller, a non-black, did not lead to him being peremptorily stricken by the state. Jurors # 1, Clark, # 4, Wharton, # 11 Hofheins and # 26, Birdsong also only responded to one question each. All are non-blacks and none were peremptorily stricken by the state.

Andrew Thrower made only one response during voir dire. He stated that he knew juror # 15, Ronald Foley. A similar response by juror # 3, Allen, # 15, Foley and # 31, Sharp did not lead to them being peremptorily stricken by the state. All are non-blacks. Jurors # 1, Clark, # 4, Wharton, # 11, Hofheins and # 26, Birdsong also only responded to one question each. All are non-blacks and none where peremptorily stricken by the state.

Mack Key made no responses whatsoever during voir dire. Jurors # 13, West, # 14, Squiers and # 38 Brockman made no responses during voir dire. All of them are non-blacks and none was peremptorily stricken by the State.

George Harvard made only one response during voir dire. He stated that he worked for Ford, but that he knew neither jurors Thrower nor Foley. Jurors # 1, Clark, # 4, Charton, # 11, Hofhiens and # 26, Birdsong also only responded to one question each. All are non-blacks and none were peremptorily stricken by the state.

The foregoing analysis is supported by the actual record. It is also apparent that the striking of prospective jurors resulted in the striking of 71.4% of the black veniremen, as opposed to the striking of 5.9% non-black members. This, of course, under the conclusion reached by the majority upon the support of federal authority cited, is sufficiently acceptable. This dissent asserts that the holding of the majority falls short of what should be done and is, in fact, pure hypocrisy.

Appellant concludes that the foregoing analysis discloses the systematic exclusion of blacks from his venire panel by the use of peremptory challenge, thus denying him a fair and impartial jury constituted of a cross-section of the community.

The irony of the situation is noted at this point. The majority opinion, once again supported by federal case authority, denounces discriminatory selection of jurors, acknowledges it was done herein, but concludes it was permissible.

Before this court, appellant argued that his particular situation is controlled by the recent United States Supreme Court deci-

sion in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[1] Respondent herein asserted that *Batson* did not apply to appellant because appellant was of a different race (white) than the prospective jurors who were stricken (blacks).

In the opinion of this writer, respondent's position is correct, but more importantly, the ruling in *Batson* supports the view expressed *supra* that in the self-proclamation of social justice, decisions by our courts not only fail to totally resolve an issue, but in some cases create hypocrisy. It is hoped that this writer's analysis of *Batson* will illustrate the above claims.

In *Batson*, the United States Supreme Court made a major departure from its previous ruling in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), addressing the exclusion of prospective jurors by use of peremptory challenges.

In *Swain*, the court had ruled that an accused could assert an equal protection claim upon the systematic and discriminatory use of peremptory challenges by the prosecution, but that the accused bore the evidentiary burden to show a perversion of the system. It was decided that the accused in *Swain* had failed to carry his burden and relief was denied.

Some twenty-one years later, the United States Supreme Court agreed to take up the case of *Batson v. Kentucky*, *supra*. At the outset, certain observations should be made concerning *Batson*. First, it is interesting to note that in *Batson*, the petitioner specifically disclaimed any reliance upon the Equal Protection Clause of the 14th Amendment to the United States Constitution, but rather, his claim was based upon the 6th Amendment to the United States Constitution. When asked by the members of the United States Supreme Court, petitioner made it quite clear that he was not claiming any denial of equal protection and was not making any direct attack upon the rule previously announced in

*Swain*. Yet, the court majority in *Batson* ruled the issue upon the basis of equal protection. Thus, it can be fairly stated that *Batson* has continued the march toward total destruction of *stare decisis*. In the future, it is submitted, neither counsel nor litigant may enjoy any assurance that the United States Supreme Court will consider and dispose of litigation upon the legal issues presented to it by honoring precedent and by employing the *stare decisis* principle. It appears that neither counsel nor litigant can ever be assured upon what the United States Supreme Court might base an opinion.

Both counsel and litigant are left to wander upon a sea of confusion and uncertainty. In light of the court's action, a doomsayer might set forth a viable argument that such action finally spells the demise of our legal system as we have known it to be for more than two centuries. Such continued departure from time-honored and well-reasoned adherence to *stare decisis* makes it necessary for attorneys and other citizens as well to wonder what the role of the highest court in the land really is. If *stare decisis* is no longer a viable part of our legal system, then has the court become merely another legislative branch of the government? Such a position, if indeed it has been reached, is not only frightening but if permitted to continue can be directly destructive of a representative democracy, for such an additional legislative branch, unlike the time-honored traditional legislative branch, would never be directly answerable to the people.

A further observation of *Batson* clearly discloses that the ruling announced therein is one based upon and controlled by the race of the accused. The rule in *Batson* limits consideration of exclusion of prospective jurors to the race of the accused. Stated another way, exclusion of prospective jurors is directly and exclusively determined and hence controlled by the race of the accused. Thus, it cannot be said, in all honesty, that *Batson* is a case which moves

---

1. *Batson* has been held to be retroactive, *see Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

our legal system any closer toward a goal of full representation of persons of all races concerning participation by such persons as jurors.

Indeed, if *Batson* were held to control in the instant case, this court would be required to deny appellant any relief. Why? Because appellant's race is different than the race of the prospective jurors struck by peremptory challenge. While the race of the accused in *Batson* (a black male) and the accused herein (a white male) obviously differs, it can also be readily observed that in both cases, the race of the accused, under the rule in *Batson*, controls.

A further observation of *Batson* must be made. Although the majority opinion in *Batson* recognized the "important position" of peremptory challenges in our legal system, it disclaimed that the ruling in *Batson* would "undermine the contribution the challenge generally makes to the administration of justice." The plain truth of the matter is that the ruling in *Batson* has, in fact, created the basis for the destruction of peremptory challenges or has already destroyed the peremptory challenge.

The term "peremptory" has been defined as:

> Imperative; final; decisive; absolute; conclusive; positive; not admitting of question, delay, reconsideration or of any alternative. Self determined; arbitrary; not requiring any cause to be shown.

Black's Law Dictionary 1023 (rev. 5th ed. 1979). "Peremptory challenge" has been defined as:

> The right to challenge a juror without assigning a reason for the challenge. In most jurisdictions each party to an action, both civil and criminal, has a specified number of such challenges and after using all his peremptory challenges he is required to furnish a reason for subsequent challenges.

Black's Law Dictionary 1023 (rev. 5th ed. 1979).

With the rule in *Batson*, peremptory challenges now are assigned a cause or assigned an explanation, or stated another way, under prescribed conditions, peremptory challenges are transformed into challenges for cause. It is absolutely ludicrous to claim that peremptory challenges in criminal proceedings continue to have any vital significance. With the rule in *Batson*, the door has been opened to allow or encourage the full demise of the peremptory challenge. In the future, there only need be some additional reason claimed for the disclosure for the exercising the peremptory challenge. To be sure, the innovation of today's legal talent, coupled with the ear of the court receptive to that innovation, ensures that the next step of additional reasons for disclosure cannot be too far away. Further, since *stare decisis* is no longer a viable part of our legal system, a court can, on its own initiative, institute further basis for disclosure of the reasons for the exercise of peremptory challenges. The simple and honest conclusion that must be reached is that the peremptory challenge has now been eliminated from our system. In fact, this is precisely what is urged by Justice Marshall in *Batson, supra.*

Peremptory challenges are prescribed by statute in our state. *See* § 546.180, RSMo 1978. It is suggested that this statute has been abrogated by the ruling in *Batson*. It would appear that in the future, the best method of jury selection would be to qualify the entire venire panel, that is, to conduct the voir dire as in the past to the point of exercising the peremptory challenge and then require the court to seat the first twelve jurors or the appropriate juror number if less than twelve, and require the parties to accept the first twelve or other number as the final jury panel.

Such a procedure would ensure two things. First, it would avoid any future snare which might be created by a reviewing court regarding its election not to follow the principle of *stare decisis*, and it would remove the newly created addition of disclosure of the reason for the exercise of a peremptory challenge. In addition, such a practice would ensure that no member of any race would be excluded from participation as a juror because of his or her race, nor could any challenge to the exclusion of prospective jurors be in any manner controlled by the race of the accused.

It is interesting to note that *Batson* and other cases dealing with the jury selection do not place any burden upon the accused to disclose any reason for the exercise of a peremptory challenge. If we are truly interested in the removal of bias and prejudice, whether along racial lines or any other, and we are to continue the use of peremptory challenges, then the highest court in our land should rule that both the prosecution and the defense should be required to disclose and give sufficient explanation of the reasons why prospective jurors were stricken by use of the peremptory challenge. It has long since been forgotten that the prosecution is the representative of the people and the people are also entitled to a fair and impartial jury. Full disclosure by both the prosecution and the defense would insure that both parties have secured a fair and impartial panel. As will be noted, *infra,* however, if peremptory challenges are to continue, then the people, as a party to criminal proceedings and in the truest sense, are not afforded the same protection as an accused by the wording of our state constitution.

If this court were to dispose of this case under *Batson,* appellant would be afforded no relief. The simple reason is that appellant is white and the prospective jurors who were stricken were black. Thus, appellant is not of the same cognizable racial group as the stricken jurors. This court has so held. *State v. Christensen,* 720 S.W.2d 738, 739 (Mo.App.1986). Stare decisis is still alive in this state. *Batson* does not control the present case.

In contrast, appellant has presented this appeal under the 6th Amendment to the United States Constitution, which affords him a trial by an impartial jury. Our own constitution, Article I, § 18(a), affords appellant the same constitutional safeguard. It suffices to state that the 6th Amendment is applicable to this proceeding. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 191 (1968), *reh. denied,* 392 U.S. 947, 88 S.Ct. 2270, 20 L.Ed.2d 1412 (1968).

The question to be answered herein can be stated in a very simple way. Can appellant herein, who is white, present a valid challenge to the exclusion of prospective jurors, who are of another race (black herein), upon the premise that the exclusion of prospective jurors, who are of any race other than an accused (appellant), thus denies an accused (appellant) his right to a jury drawn from a fair cross-section of the community?

Under the federal constitution, the right to an impartial jury includes the right to a jury drawn from a fair cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). It is interesting to note that both the 6th Amendment to the United States Constitution and § 18(a) of Article I of the Missouri Constitution prescribe that *an accused* shall be entitled to a speedy trial by an *impartial jury.* This same dilemma was faced by the Colorado Supreme Court in *Fields v. State,* 732 P.2d 1145 (Colo. banc 1987). With the awareness of such limited wording, coupled with the determination to insulate jury panels from prejudice of whatever nature, how are the courts to fully acknowledge the constitutional mandate of an accused's rights to a speedy trial by an impartial jury and also insure the same right to the people?

One approach would be to continue the past policy of simply not mentioning or even recognizing the people's right in this regard. This, however, would be to perpetrate only the half-truth policy, which has been inherent in most previous federal and state court decisions, with the possible lone exception of decisions by the courts of California. Our sister state of California enjoys a constitutional provision [2] which applies to both parties. The Supreme Court of California has so ruled. *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978).

On the other hand, how are states like our own supposed to address this problem?

---

**2. § 16. Jury trial; three-fourths verdict; waiver of jury trial; number of jurors.**

Sec. 16. Trial by jury is an inviolate right and shall be secured to all, but in a civil cause

three-fourths of the jury may render a verdict.... (Cal. Const. Art. I, § 16 (1980))

In other words, if fairness is to be required, then should it not apply as a right of the people as well as an accused? Common sense and the American belief in fair play would require an affirmative answer to the question. Yet, how is it to be known that an accused has not committed, by the use of peremptory challenges, the same grievous offense of striking prospective jurors upon some prejudicial basis that the courts have so closely scrutinized and condemned when committed by the prosecution? As regards the 6th Amendment, the federal court has previously ruled that neither side may systematically exclude prospective jurors by the use of peremptory challenges. *Booker v. Jabe*, 775 F.2d 762, 772 (6th Cir.1985).[3] This rule should be adopted by the United States Supreme Court.

In light of the constraint imposed by the wording of the 6th Amendment and of § 18(a) of Article I of the Missouri Constitution, the only apparent way to insure that both parties secure an impartial jury, which must include a fair cross-section of the community, is to eliminate in toto the use and exercise of all peremptory challenges by both parties. If such use and exercise were eliminated, then a venire panel could be examined for cause, and once that is accomplished, the trial court could seat the first twelve jurors (or where applicable, a lesser number) and both parties would be bound to accept the jury panel. Such a procedure would eliminate any suspicion or question of whether either party struck any prospective juror upon any *undisclosed* basis of prejudice. It would also eliminate a great deal of avoidance by both federal and state courts in facing the basic issue of insuring to both parties an impartial jury drawn from a fair cross-section of the community.

Opponents to the elimination of the peremptory challenge allude to the fact that the Supreme Court has declared that a jury made up from a fair cross-section of the community need not "mirror" the community, nor is an accused individual entitled to a jury of any particular composition. *Taylor v. Louisiana, supra.* They further declare that use of peremptory challenges "allows the covert expression of what we dare not say but know is true more often than not." This quote is from Babcock, *Voir Dire: Preserving "Its Wonderful Power",* 27 Stan.L.Rev. 545, 553–554 (1975), relied upon by Chief Justice Burger in *Batson, supra,* 106 S.Ct. at 1736.

There has arisen a contradiction which was first expressed in *Taylor, supra,* and continued through a myriad of decisions since *Taylor* to the current case. The contradiction, or as this writer desires to label it, the hypocrisy, is simply that the courts have said there cannot be any systematic exclusion of persons from venire panels because this would prevent an array of a fair cross-section of the community, *Taylor, supra;* but in the final determination, the petit jury, the very body which must decide the fate of an accused, need not "mirror" that same community. Stated another way, the courts continue to say there shall be no discriminatory, systematic exclusion at the venire panel level, but a "little bit" of discrimination at the level of selection of the petit jury is acceptable. This is not only evident contradiction, but is pure hypocrisy as against the claim of judicial social justice.

That the foregoing is so, one only need refer to the majority opinion herein which reaches the very conclusion set forth above. In all fairness to this court's majority opinion, it is simply following the lead of our federal courts on the issue when it relies upon *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986); *Batson, supra,* and *Roman v. Abrams,* 822 F.2d 214 (2d Cir.1987).

The rationale appears to be, from the majority herein and the authority upon

---

**3.** The Supreme Court granted certiorari and vacated and remanded the case to the United States Court of Appeals for the Sixth Circuit for further consideration in light of *Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) and *Batson, supra. See Michigan v.* *Booker,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986).

This writer cites *Booker v. Jabe, supra,* for the purpose of urging the Supreme Court to adopt the rule as set out therein.

which it relies, that the discriminatory systematic exclusion of prospective jurors is an acceptable process so long as that process is maintained within a percentage of the population which, in turn, is a percentage of the total community population.

This writer finds it unbelievable, and of course, unacceptable, that the courts of this country can, in the same breath, condemn the discriminatory exclusion of persons from participating in the jury process, and then exclaim such discrimination is acceptable if not extended too far. It's like the wife saying to her husband, "Hey, everything is under control, I am only a little pregnant!" That the federal courts have taken such a position is no basis for the courts of this state to follow blindly down the same ridiculous path.

The posture of this whole issue has placed the guarantee of participation of a venire panel upon the basis of the color of a person's skin or the particular gender of community members. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). This raises a question of what other possible "cognizable groups" might be suggested to be within our community and will the courts set a limit upon "cognizable groups" and thus apply the foregoing rationale of percentage participation upon petit juries?

This writer thinks that the conclusion reached by prior decisions and adopted by the majority opinion herein has produced a two-fold and undesirable result for our people. First, the courts are saying there shall be no discrimination to prevent persons to participate on venire panels based upon race or sex. Said another way, one's participation is guaranteed on the basis of race or sex. Such a result ignores the elements of ability and willingness of participation. Secondly, at the petit jury level, the courts are saying it is quite acceptable to exclude persons on the basis of race or sex provided that members of that race or sex are, by a prescribed percentage, represented on the petit jury. Such a posture is not only hypocritical, but it is an outright affront to any individual willing and capable of serving on any petit jury. What is being said to the individual is that your intelligence and willingness to serve as a petit jury can be ignored by systematic, discriminatory exclusion so long as a percentage representation of "your group" is on the jury.

Well, what is the possible solution to the problem? Needless to say, while such a ruling might be claimed profound, the solution to the problem, in reality, lies with the total elimination of the peremptory challenge.

This court is still faced with the consideration of the particulars of the instant case in that appellant is a member of a cognizable racial group different from a cognizable racial group of the stricken veniremen, relative to the 6th Amendment. A few of our sister states have resolved this issue, but too few offer any real guidelines beyond the particulars of the cases decided.

The majority has correctly concluded that *Batson* has no application to the present case. Allowing that appellant's claim herein is premised upon his claim of being denied an impartial jury under the 6th Amendment and Article I, § 18(a) of the Missouri Constitution, and while awaiting the possible demise of peremptory challenges, this court should adopt a standard which has been articulated for voir dire in such a situation. This standard has been set forth in *McCray v. Abrams,* 750 F.2d 1113, 1131 (2nd Cir.1984)[4] which adopted the standard expressed by the United States Supreme Court in *Duren v. Missouri, supra,* which this court should find persuasive and which this court should adopt herein. This standard has been expressed as follows:

**4.** The Supreme Court granted certiorari and vacated and remanded the case to the United States Court of Appeals of the Second Circuit for further consideration in light of *Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), and *Batson, supra. See Abrams v.*

*McCray,* —— U.S. ——, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986).

This writer cites *Abrams* for the purpose of urging the court to adopt the rule as set out therein.

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Thus, what is readily observable is that the principles applied to prohibit the automatic exemption or exclusion of women from jury venires, *Duren, supra*, are equally applicable to the exclusion of veniremen by the exercise of the peremptory challenge. The only difference is the exclusion of requirement (2) above, hence it is not applicable to cases dealing with peremptory challenges. Thus, the rule or standard could be expressed as follows: In order to establish a prima facie violation of the fair cross-section requirement, an accused must show (1) that the group alleged to be excluded is a distinctive group in the community, and (2) that there existed the systematic exclusion of the group in the jury selection process.

If the foregoing standard were adopted, true determination of appellant's claim could be made. It is obvious that the record discloses that the excluded or stricken veniremen were black and it is without question that these veniremen were of a distinctive group. It, therefore, must be concluded that appellant's claim meets the first requirement of the foregoing standard.

In addressing the second requirement of the standard, it is unnecessary to again set forth verbatim that portion of the voir dire which deals with this issue. That has been set forth above. A careful reading of the entire voir dire leads to the inescapable conclusion that the striking of the veniremen herein was due to the systematic exclusion of "the group" (i.e., black veniremen) during that portion of the jury selection process, attributable to the exercise of peremptory challenges by the prosecution.

Cross-reference to questions asked of both white and black venireman and the responses given by each reveals no other basis for the striking of these veniremen except on the basis of their race. It is also noted that on this appeal that the respondent does not even confront appellant's allegation with regard to the examination questions and the answers obtained from the various veniremen. Respondent merely asserts that *Batson* applies and controls, and therefore appellant has no standing to raise the issue.

It should be noted under the above suggested standard, direction is to the *jury selection process* which includes the selection of petit jurors. Furthermore, the above standard would leave no room for judicial construction that an accused must be of the same racial or sexual group or have some other identifiable mark as the excluded group. Under such standard, appellant herein has met all requirements necessary to warrant a new trial.

By virtue of the present case, this court has a real opportunity to eliminate any discrimination in the selection of jurors in criminal proceedings instead of simply following the ill-conceived solution set forth in numerous prior federal and state decisions.

This court should either rule that the use of peremptory challenges is no longer applicable to juror selection in criminal cases and that it was error for the trial court to have failed to quash the jury panel as requested by this appellant, or this court should rule that the standard for juror selection, both at the venire panel level and petit jury level, is as prescribed above, and that such standard was applicable to the present proceeding and the trial court erred in not applying such standard to the present proceedings.

Appellant is entitled to a new trial, for his rights under the Sixth Amendment to the United States Constitution, and those same rights guaranteed under Mo. Const. Art. I, § 18(a) have been been violated. The only thing that separates this appellant from the accused in *Batson* is the color of his skin.

It is well past the time that our courts remain content with the mere pacification of one or more "cognizable groups" in society and for the first time in our history, adopt a meaningful process by which any accused can be guaranteed a jury free of any discriminatory selection process, and by which all of our citizens may participate in the process free from any racial, sexual, or other descriptive label. The partial discriminatory practice now sanctioned by our courts, including this court by the adoption of the majority opinion herein, has no room in a legal system which by outward proclamation condemns discrimination in the selection of jurors.

It is a pure hypocrisy to exclaim to the world at large the evils of discrimination in the jury selection process and then in the same exhortation declare that limited discrimination is permissible. The color of the skin of this appellant and that of the stricken jurors herein should not be the criteria upon which the selection of a jury should rest. Appellant herein has, by evidence upon the record, established the systematic exclusion of persons from his jury panel. This fact alone entitles him to a new trial.

There is a way to insure that this appellant and all so situated in the future may select a jury free from any suggestion of discrimination in the selection process. This court has chosen simply to ignore its responsibility in removing all discrimination and has, as a result, merely furthered the contradictory and hypocritical practice which now exists within our system.

This judgment should be reversed and this cause remanded for retrial with directions to the trial court in line with the foregoing suggestions of either prohibiting the use of peremptory challenge in criminal cases or the application of the suggested standard in the jury selection process.